# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 21-00193-01-CR-W-BCW |
| MALACHI ROBINSON, | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America respectfully submits its Sentencing Memorandum for consideration in the sentencing of defendant Malachi Robinson. On August 10, 2021, Robinson was charged in a 2-count indictment with violating the Matthew Shepard James Byrd Jr. Hate Crimes Prevention Act under 18 U.S.C. § 249(a)(2) involving an attempt to kill (Count 1), and with the use and discharge of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (Count 2). On July 7, 2022, Robinson pled guilty to Count 1 of the indictment, and the government agreed to move to dismiss Count 2 of the indictment at sentencing.

Pursuant to the plea agreement, the Government agreed that it would not seek a sentence in excess of the guideline range. In the plea agreement, the parties calculated the total offense level of 37, with an expected sentencing guidelines range of 210 to 262 months imprisonment. The Presentence Investigation Report (PSR) calculated the total offense level at 42, including an additional upward adjustment for obstruction of justice, and declining to apply any reduction for acceptance of responsibility, noting that the application of the latter is well within the discretion of the Court. (*See* ¶¶36-49 PSR). Based on the calculated criminal history category I, the

1

guidelines range for offense level 42 is 360 months to life imprisonment. With the application of a 3-point reduction for acceptance of responsibility, the guidelines range for offense level 39 is 262-327 months imprisonment.

In advance of the sentencing scheduled on April 20, 2023, the government submits this sentencing memorandum in support of its recommendation for a sentence of 262 months imprisonment. This recommendation falls within the applicable guideline range for both the agreed upon calculations in the plea agreement and the PSR calculations, should the court decide in its discretion to apply the acceptance of responsibility points. Furthermore, the government believes this sentence is sufficient, but not greater than necessary to serve the purposes set forth in 18 U.S.C. § 3553(a).

## I.     Factual Background

### A. The Meeting and Shooting

On May 29, 2019, Robinson, a 21-year-old man at the time, shot M.S., a then 16-year-old Black male, eight times in Kansas City, Missouri, because of M.S.'s sexual orientation. Robinson and M.S., who did not previously know one another, were both in the Kansas City Public Library. M.S. approached Robinson in the library and asked Robinson if he could "friend" him on Facebook. Robinson then wrote his Facebook name, "Mally Robinson," down on a piece of paper which KCPD Officers later found in M.S.'s pants pocket. M.S. took the piece of paper, went back to his computer in a different part of the library, and sent a Facebook friend request to Robinson. Robinson accepted M.S.'s request, and the two began talking over Facebook Messenger. In the brief conversation that followed, M.S. asked if Robinson was gay and

2

Case 4:21-cr-00193-BCW   Document 34   Filed 04/11/23   Page 2 of 13

propositioned him. Robinson said he was not gay but continued to engage with M.S. about where they might go to complete a sex act.

At approximately the same time, Robinson was also communicating separately with his then fiancé, J.R., about the interaction he was having with M.S. J.R. spoke with KCPD officers a few days after the shooting and provided them with messages and images documenting her conversation with Robinson. Robinson sent J.R. a screenshot of M.S.'s Facebook page status, which stated that M.S. "need[ed] some dick like right now. . .", as well as a picture of the Facebook message from M.S. asking if Robinson was gay. Robinson wrote to J.R., "This kid at the library asked me to add him on FB so I didn't think shit about it now look . . . & we in the same building rn." Robinson kept communicating with J.R., saying at one point that "He tryna set me up on sumn now, gonna unfriend him, might shoot this boy if he try some gay shit."

Robinson and M.S. met up outside the library where M.S. offered Robinson $5.00 for oral sex. Library surveillance footage showed that M.S. began to walk away, and Robinson followed him, catching up to M.S. before crossing the street. The two then walked for a while in the Swoop Park area, until Robinson suggested that they go into a wooded area nearby. Prior to any sex act or money exchange, M.S. changed his mind and decided not to proceed, but as he turned to leave the woods he immediately heard gunfire. M.S. fell, having been struck multiple times by the gunfire, but was able to get up and onto a sidewalk in front of the woods. He moved along the sidewalk until he eventually collapsed in front of a nearby apartment building.

KCPD officers and Emergency Medical Services arrived on scene after a bystander called 911, and they found M.S. lying on the sidewalk. Medical personnel provided immediate care to M.S. and transported him to a local hospital, where he was deemed to be in critical condition,

3

having sustained eight gunshot wounds. KCPD reports indicate that he suffered three gunshots to his right arm, one to a finger on his right hand that almost detached his finger, one to his left buttocks, and three to his chest. M.S. ultimately survived the shooting, but spent approximately two weeks in the hospital. M.S. has since suffered long-term effects of the shooting, having to undergo multiple surgeries, attend physical therapy, and still has several bullets inside of him.

**B. Robinson's Flight, Admissions, and Attempts to Lay Low**

Robinson fled the scene of the shooting, running through the woods to his apartment building, where he was seen coming out of the woods by two maintenance workers who heard the gunshots. These men recognized Robinson as someone who recently moved into the building, referring to him as "afro" because of his distinct hair. They saw the outline of a gun in his pocket, and confronted him on shooting his gun in the woods. Robinson did not deny having done so, instead asking them where he could shoot, and one of the maintenance workers responded that he had to go to a shooting range.

Robinson called J.R. after the shooting, and met up later that night at Robinson's cousin's house where he told her and his cousins that he shot the boy because he "tried that gay ass shit." In the days following the shooting, Robinson gave the firearm to one of his cousins to dispose of, talked about laying low and moving to Texas, and shaved his afro. Robinson and J.R. also exchanged messages, in which they discuss the incident in the days that followed. Robinson wrote, for example, "Man… But no suspect info so good so far[,]" and "Right but we on the low from now on so hopefully nobody suspect anything and I been leaving my gun at home so nobody can see an imprint etc. He's in critical, might end up being one but we quiet about everything and

4

gon just chill like it never happened." Robinson then went on to say that he de-activated his Facebook account, and suggested that they delete their old emails.

Robinson also conducted numerous incriminating Google searches in the days immediately following the shooting, including the following: "unsolved shootings in kc," "Kansas City shooting," "Kc homicide," "Swope parkway shootings," "[M.S.] shot," "[M.S.] kc," "how to know if the police are looking for you," "when will police arrest you after a murder," "how to get away with murder in real life," "what guard to shave bald head," "Police investigate shooting in Swope Park," "[M.S.] MO – Truthfinder," "[M.S.] obituary," "how long does it take to get fingerprints back from police gun," and "gay nigga."

In addition to the Gmail messages Robinson and J.R. were exchanging in the hours and days following the shooting, they were also exchanging TextNow messages. During an exchange about laying low and acting like the shooting never happened, Robinson said, "I be like idk what happened, im not from here tbh (emoji) and I really aint fr," to which J.R. responds, "Man imma be like i just moved down here idk whats going on in the 60's." Robinson then wrote, "Man frrr & and if he did, sad it had to be over him tryna suck my dick, sure he standing in front of the lord like I should of minded my business (emoji)."

Robinson made additional incriminating statements to others in the days following the shooting. In a Facebook Messenger exchange between Robinson and someone named "Chino Foe" on June 2, 2019, Robinson wrote, "Fuck its cool. I shot a nigga. he was being gay af and following me like a mf."

In a TextNow exchange with Robinson's cousin Deante Jones on June 1, 2019 Robinson wrote, "Cause my dumb ass, dude is in critical condition and the police know it was me according

5

to the maintenance told my girl." He then continued, "I had to cut all my hair off," and "I been chilling on the low." Jones responded, "How you know for sure bro . . . Nothing was on the news bout no shooting." After Robinson said he had seen one article, and that the maintenance man kept mentioning it to J.R., Jones replied, "Drop yo heat off at rians." Robinson said he tried, and might go again tomorrow. Jones then asked him to send the article, and Robinson forwarded a screenshot of an article that read, "Officers are investigating a shooting in the area of Meyer and Swope Wednesday around 4:40 p.m. One person is in critical condition as a result of the shooting. There is no suspect information at this time." Jones responded, "Damn," and then, "Stay low just incase." Robinson told Jones, "I am, I ain't leaving the house for the month. My hair is cut and everything. Rian said he cant, but Imma drop it off on 9th and Troost tomorrow at my girls mom place whatever she is for now." Jones then responded, "Drop it off at rians put it in the back or drop it off at my place." Robinson replied, "Bet and look up both my FBs to make sure its gone."

Robinson exchanged a series of TextNow messages with his cousin Rian Sepesi on May 31, 2019. Robinson wrote that he was "tired as hell, gonna just drop my strap off tomorrow at your crib." Sepesi responded, "Take that to DeAnte cause I have to much going on here so take it to him tomorrow," to which Robinson replied, "Bet." Sepesi then wrote, "An delete that facebook to little cousin an never get back on that shit." Robinson replied, "Fasho, I just did earlier and im off that bitch for good. My hair is cut too, I cut it with some scissors all the way off and my facial hair." Sepesi then said, "Wtf," and Robinson wrote, "Man bro, i aint trying get in trouble, not a bad person just made a bad decision, these niggas just assume its me cause I have a gun. Shit got me paranoid."

6

Phone search records also show that on June 1, 2019, Robinson purchased and downloaded "Scanner Radio – Fire and Police Scanner," an application that provides access to live police and fire scanner communications.

## II. The Presentence Investigation Report ("PSR") and The Plea Agreement

The PSR concluded that the total offense level for the offense of conviction is 42. (*See* ¶42 PSR). Based on a Criminal History category of I, the guideline range of imprisonment for an offense level 42 is 360 months to life imprisonment. The PSR calculation includes an additional 2-point enhancement for obstruction of justice pursuant to §3C1, based on Robinson attempting to delete his Facebook accounts, directing J.R. to do the same, and sending a letter to J.R. instructing her to rescind her prior statements to law enforcement. (*Id*. at ¶¶36-37). Based on the same obstructive conduct, the PSR also suggests that Robinson might not be entitled to any acceptance of responsibility under §3E1.1, but notes that the guidelines contemplate the judge having significant discretion in determining whether acceptance of responsibility points are warranted. (*Id*. at ¶38). Should the Court in its discretion apply the acceptance of responsibility points, the total offense level is 39, with a sentencing guidelines range of 262-327 months imprisonment.

Pursuant to the plea agreement, the Government and the defendant calculated the total offense level for the offense of conviction at 37.[1] This calculation applied the same base level offense (33), 4-point increase for permanent or life-threatening bodily injury, and hate crime motivation, but did not include the 2-point obstruction enhancement. The calculation also included an anticipated 3-point reduction for acceptance of responsibility, provided that Robinson continues to abide by all of the terms and conditions of the plea agreement and does not attempt

---

[1] The plea agreement set forth that the Court would not be bound by this calculation.

7

to withdraw his guilty plea, violate the law, or otherwise engage in conduct inconsistent with his acceptance of responsibility.

The government respects and understands the PSR calculation's inclusion of the obstruction of justice enhancement, as well as raising the prospect, at the court's discretion, of not granting acceptance of responsibility points due to his obstructive conduct. The parties Guidelines calculation did not include these enhancements, leading to a total offense level of 37 and sentencing range of 210-262 months imprisonment. However, the defendant also acknowledges that his conduct does constitute obstruction, arguing instead that the acceptance points are still warranted based on his clear acceptance of responsibility after the federal indictment was returned. The government recognizes that the defendant's obstructive conduct occurred while in state custody on state charges for the same conduct, which predated these federal charges to which he pled guilty in this case. It should be noted that the state charges were dismissed following the return of the federal indictment in this matter. Therefore, so long as the defendant continues to abide by the terms of the plea agreement and continues to act in a manner consistent with his acceptance of responsibility, the government will honor the plea agreement by recommending that a 3-point reduction for acceptance of his federal offense is warranted.

Based on the PSR calculation at 42, that 3-point reduction yields a total offense level of 39, which is a Guidelines range of 262-327 months incarceration. As a part of the plea agreement, the government agreed to not seek a sentence outside of the calculated guidelines range, and based upon the parties calculated Guidelines range, believed that a sentence of 262 months imprisonment was appropriate under the circumstances. Despite the additional 2-point obstruction enhancement, the government maintains that 262 months imprisonment is an appropriate sentence,

and falls within the guidelines range contemplated by the parties and the higher range calculated in the PSR, assuming the Court grants the defendant a three-level reduction for acceptance of responsibility. As noted in the PSR, the Guidelines, and the Plea Agreement, the court is the final arbiter of the sentence, and thus has the discretion of determining whether the defendant's conduct does or does not qualify for the 3-point reduction for acceptance of responsibility.

### III. Sentencing Considerations in General

In any given case, a sentencing court is required to impose a reasonable sentence, which is reviewed for procedural error, then for substantive reasonableness under a deferential abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 50 (2007); *United States v. Booker*, 543 U.S. 220 (2005); *United States v. Washington*, 515 F.3d 861, 865 (8th Cir. 2008). While the Guidelines are no longer mandatory, they should be "the starting point and the initial benchmark" in determining an appropriate sentence. *Gall,* 128 S. Ct. at 597. Courts then are to consider the factors set forth in 18 U.S.C. § 3553(a). *Id.* Abuse of discretion under § 3553(a) occurs if a court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only the appropriate factors but commits a clear error of judgment in weighing those factors. *United States v. Kowal*, 527 F.3d 741, 749 (8th Cir. 2008).

Discussing these factors in *United States v. Booker*, 543 U.S. 220 (2005), the Court stated:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The courts, in determining the particular sentence to be imposed, shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for:

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines:

(I) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28;

(5) any pertinent policy statement;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

## IV. Determination of the Appropriate Sentence

The government respectfully requests that the defendant be sentenced to term of 262 months imprisonment. Such a sentence honors the plea agreement between the parties, while also accounting for the higher total offense level as calculated by the PSR, assuming the Court grants the defendant three levels for acceptance of responsibility. A sentence of 262 months imprisonment is sufficient, but not greater than necessary, to comply with the sentencing purposes in 18 U.S.C. § 3553(a)(2) for the following reasons:

Such a sentence would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the defendant's conduct. 18 U.S.C. § 3553(a)(2)(A). This sentence would also provide deterrence against this type of violence in the future. 18 U.S.C. § 3553(a)(2)(B). Robinson's conduct was egregious—he senselessly shot M.S., nearly killing him, because of a homosexual proposition. Robinson had every opportunity to simply ignore M.S., to choose not to catch back up with the victim outside of the Library, or to walk away during their long walk through Swoop Park. But instead, Robinson played along, intentionally led M.S. to believe that a sexual encounter would occur, and lured him into the woods, only to pull out a semi-automatic handgun and shoot to kill his unsuspecting 16-year-old victim. His actions were premeditated and calculated, evidenced by Robinson's message to J.R. that he "might shoot this boy if he try some gay shit." Such conduct is utterly unacceptable, demanding of punishment sufficient to hold Robinson to account for his specific actions. The government's recommended

11

sentence will also deter Robinson from committing similar crimes in the future, and send a clear signal that such bias-motivated violence will not be tolerated in American society, deterring other likeminded individuals from committing similar offenses.

## VI. Conclusion

For the foregoing reasons, the government respectfully recommends that the defendant be sentenced to a term of imprisonment within the applicable guideline range of 262 months imprisonment.

Respectfully submitted,

By: */s/ David M. Ketchmark*

DAVID M. KETCHMARK
Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 E. Ninth Street, Suite 5510
Kansas City, Missouri 64106
Telephone No. (816) 426-3122

*/s/ Eric N. Peffley*

Eric N. Peffley
Trial Attorney
Civil Rights Division

150 M St., NE, Suite 7.1106
Washington, D.C. 20002

CERTIFICATE OF SERVICE

      The undersigned hereby certifies that a copy of the foregoing was delivered on April 11, 2023, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

                                                */s/ David M. Ketchmark*
                                                David M. Ketchmark
                                                Assistant United States Attorney

13

Case 4:21-cr-00193-BCW   Document 34   Filed 04/11/23   Page 13 of 13